Rosa Arcilia Oyola, etc., demandantes y recurridos, v. Sucesión Arturo Collazo, etc., demandados y recurrentes.

Número: R-63-278 Resuelto: 19 de febrero de 1965

---

*Rafael L. Franco García*, abogado de los recurrentes; *Carmelo Ávila Medina*, y *Roberto Ávila Rivera*, abogados de los recurridos.

Sala integrada por el Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Se trata de responsabilizar a los dueños de un tractor por las lesiones sufridas por un menor mientras manejaba el tractor en una finca. A los fines de disponer del caso, debemos resolver si el empleado de aquellos que controlaba el tractor estaba autorizado por ellos para invitar al menor a montarse y conducir dicha máquina o si la actuación del menor de manejar el tractor "tiende al logro de la encomienda del patrono, pudiendo redundar en beneficio de éste."

El menor Eustaquio Velázquez Oyola fue gravemente lesionado en 10 de abril de 1962 al volcarse un tractor de los denominados "Zancú", propiedad de los recurrentes, mientras lo guiaba dentro de una finca de éstos, en el barrio Ceiba Sur del Municipio de Juncos. De acuerdo con las determinaciones

de hecho del tribunal de instancia, dicho menor estaba quemando paja en la finca en cuestión; cuando terminó y mientras se dirigía a su casa fue invitado por un empleado de los recurrentes, Joaquín Rivera Arsuaga, quien pasó por su lado manejando el referido tractor, para que se montara en éste; se dirigieron hacia una grúa y en el viaje de regreso, a solicitud de Rivera, Velázquez tomó el guía y controles del tractor; al acercarse a bastante velocidad a una bifurcación, Rivera súbitamente le indicó a Velázquez que virara hacia una pieza de caña, y al éste efectuar un viraje violento, se volcó el tractor cayendo el menor debajo, lo que le ocasionó una fractura compuesta diminuta de la tibia derecha y una fractura del femur izquierdo; en la fecha del accidente Velázquez no trabajaba habitualmente para la referida Sucesión, sin embargo, él había manejado el tractor envuelto en el accidente en varias ocasiones a solicitud de Arturo Collazo Jr., administrador de los negocios de la Sucesión y quien había dado instrucciones a Joaquín Rivera para que instruyera al menor en el manejo del tractor. Concluyó dicho tribunal que al permitir Rivera que Velázquez condujese el tractor, lo hizo con la autorización implícita de Collazo Jr., y por lo tanto, la negligencia de Rivera es imputable a los demandados. Determinó, además, que Velázquez también incurrió en negligencia. Estimó sus daños en $10,000 y que su negligencia contribuyó en un 50% a la ocurrencia del accidente. En tal virtud, condenó a los recurrentes a pagar al menor la suma de $5,000 y pagar a la madre de éste, Rosa Arcilia Oyola, la suma de $2,500 más las costas.

No conforme, apuntan los recurrentes que el tribunal de instancia erró al resolver (1) que el conductor del tractor tenía autoridad implícita de su patrono para permitir que éste condujera el tractor en cuestión y (2) que los recurrentes son responsables de los daños sufridos por el recurrido Velázquez Oyola.

 De acuerdo con la doctrina que establecimos en *Martínez* v. *Comunidad M. Fajardo*, 90 D.P.R. 461 (1964), la responsabilidad en casos como éste no puede fijarse mediante la aplicación de las disposiciones de la Sec. 13-101 de la Ley de Vehículos y Tránsito, 9 L.P.R.A. sec. 1751. [1] Debemos, por lo tanto, determinar si el empleado de los demandados Joaquín Rivera había sido autorizado para montar al menor lesionado y enseñarle a manejar el tractor o, en ausencia de tal autorización, si su gestión de permitir a Velázquez manejar el tractor "tiende al logro de la encomienda del patrono, pudiendo redundar en benficio de éste."

En *Martínez*, supra, en que responsabilizamos al patrono demandado por las lesiones sufridas por un menor mientras iba montado en un tractor "Zancú", se estableció que el menor había sido invitado por el conductor del tractor, que era un empleado del demandado, para que lo ayudase a enganchar unos carros al tractor y el accidente ocurrió cuando dicho empleado llevaba al menor en el tractor al sitio donde lo recogió. Se demostró en este caso que el empleado no podía enganchar los carros sólo y que no habían otras personas a quienes recurrir. Propiamente concluimos que el referido empleado tenía autorización implícita para gestionar la ayuda

---

[1] En *Cordero Santiago* v. *Lizardi Caballero*, 89 D.P.R. 150 (1963), hicimos un recuento histórico del alcance de la responsabilidad establecida por el Art. 1803 del Código Civil, ed. 1930 (31 L.P.R.A. sec. 5142), de aquellos que no han causado de una manera directa un daño, tratándose de culpa extracontractual, y en él concluimos que de acuerdo con la referida Sec. 13-101 de la Ley de Vehículos y Tránsito, "la mera posesión voluntariamente autorizada de un vehículo de motor es suficiente para imponer responsabilidad a su dueño." En *McGee Quiñones* v. *Palmer*, 91 D.P.R. 464 (1964), responsabilizamos al dueño de un automóvil por las lesiones ocasionadas al demandante al volcarse dicho auto mientras era guiado por un invitado del hijo del dueño del taller donde el demandado dejó el vehículo para que se lo lavaran, engrasaran, repararan y lo devolvieran a su residencia. Dicho joven utilizó el automóvil para irse a pasear con otros a quienes invitó, uno de los cuales era el lesionado. Señalamos que, como la devolución del automóvil a la residencia de su dueño requería que en algún momento se operara en la vía pública, dicha operación formaba parte principal de la entrega del vehículo.

que requirió del lesionado con el fin de lograr la encomienda de su patrono. En *Vargas Vargas* v. *Belthor Cáceres Corp.*, 90 D.P.R. 37 (1964), se responsabilizó también al patrono de un conductor de un vehículo en que vendía y entregaba mercancía a clientes del patrono, por las lesiones sufridas por un menor que el empleado llevaba en el vehículo, en contra de instrucciones específicas de no hacerlo y que ayudaba al empleado velando la mercancía en el vehículo mientras éste se ausentaba para tomar pedidos de los clientes y servirles la mercancía. En *Martínez* v. *U.S. Casualty*, 79 D.P.R. 596 (1956), responsabilizamos a un municipio por la muerte de una persona que iba en una ambulancia del municipio a buscar medicina a una farmacia para su esposa enferma que poco antes había sido conducida en dicha ambulancia al hospital del municipio. La muerte fue ocasionada al chocar la ambulancia contra un poste mientras era guiada negligentemente por un bombero estatal a quien se le había encomendado por el alcalde para que trasladase a la enferma. Determinamos en este caso que la actuación del conductor de llevar al esposo a buscar las medicinas tenía una conexión razonable y pertinente con los intereses del municipio ya que tendía a imprimirle la efectividad a un objetivo principal del municipio, como lo era el prestar el mejor servicio de beneficencia pública a la comunidad. En *Rivera* v. *Maldonado*, 72 D.P.R. 479, 483 (1951), nos negamos a responsabilizar al dueño de un vehículo por las lesiones sufridas por el demandante mientras viajaba en el mismo porque "No se alegó, ni se probó, que al invitar el chófer a Juan Rivera a montar en el camión fuera con el fin de realizar función alguna para beneficio del dueño del mismo." En *Llorens* v. *Lozada*, 73 D.P.R. 271 (1952), responsabilizamos al dueño de un camión, estacionado sin luces en una carretera por su conductor mientras éste iba a su casa a dormir, por la muerte de una persona al chocar el automóvil en que viajaba con el camión así negligentemente estacionado. Concluimos que al estacionar el camión su conductor no se

apartó de las atribuciones de su empleo sino que su fin primordial fue estar en situación de servirle a su patrono al día siguiente, de manera que su negligencia en el estacionamiento es imputable al patrono. El hecho que el conductor hubiese violado sus instrucciones de estacionar el camión por las noches en la grúa y nunca dejarlo en la carretera, no constituye una defensa en estos casos. Véase, además, *Mártir Santiago* v. *Pueblo Supermarket*, 88 D.P.R. 229 (1963).

A la luz de la doctrina expuesta, es necesario examinar la prueba a los fines de determinar si sostiene la conclusión del tribunal de instancia al efecto de que Collazo Jr. había dado instrucciones a Joaquín Rivera para que instruyera al menor Velázquez en el manejo del tractor y que dicho menor había manejado el tractor en varias ocasiones a solicitud de Collazo Jr. El tribunal no hizo determinación alguna con respecto a si, en efecto, el que el menor guiase el tractor beneficiaba o no a los demandados como dueños del mismo.

En su examen directo, Velázquez testificó lo que el juez sentenciador relacionó en sus determinaciones de hecho a que hicimos referencia previamente con respecto a cómo ocurrió el accidente. No declaró, ni aparece en el récord prueba alguna de que Collazo hubiese dado instrucciones al conductor Rivera para que enseñase a Velázquez a conducir el tractor. A nuestro juicio, la prueba no sostiene la conclusión de que Rivera había sido autorizado para instruir a Velázquez en el manejo del tractor. Por el contrario, justifica concluir que el conductor Rivera no tenía autorización para instar al menor a subirse y manejar el tractor y que al permitírselo no actuaba dentro de las atribuciones de su empleo. Veamos. Velázquez quemaba paja momentos antes de subir al tractor por su propia iniciativa pues en ese momento y desde hacía dos semanas no trabajaba para los recurrentes. Dice que había trabajado antes en el cultivo y regando abono, y para los recurrentes en el recogido de caña en las piezas, pero no en vehículos, pero que estaba practicando a guiar tractores; que no iba a las

clases de conducirlos que ofrecía Brewer porque no tenía la edad. Admitió que Collazo no le dio permiso para montarse en el tractor en la ocasión del accidente, pero que se lo había dado antes; más específicamente, que Collazo le dijo a Velázquez un año antes frente a un tal Celino (que ya no era empleado de los recurrentes) que a Velázquez le dieran práctica en conducir los tractores. También testificó que si Collazo hubiera estado allí no se hubiera montado al tractor; que le gustaba practicar y bregar con tractores en otras fincas y lo había hecho aunque no le habían dado permiso para ello. Los recurrentes tenían conductores suficientes para manejar sus tractores. Hubo prueba de que en otra ocasión, Velázquez tomó y condujo un tractor sin permiso de su conductor. Collazo declaró que había despedido del trabajo a Velázquez porque había tomado un tractor sin permiso; que no había autorizado que le dieran clases en tal operación porque el Departamento del Trabajo da esas clases y paga por enseñar; que el día del accidente Velázquez vino a pedirle trabajo y le contestó que todavía no, que lo pensaría en vista del castigo que le había impuesto por tomar una máquina sin autorización; que no necesitaba más tractoristas; que tiene prohibido a los operadores que monten otras personas y si ve que lo hacen, "les para el vehículo."

Resulta de la anterior relación que no hubo prueba alguna de que Collazo Jr. autorizase a Rivera a instruir a Velázquez en el manejo del tractor ni de que éste lo manejase a solicitud de Collazo. La prueba demuestra, más bien, que Velázquez estaba ansioso de aprender a conducir dicha máquina y a esos efectos había montado y conducido máquinas de ese tipo sin permiso de sus conductores. En vista de que Velázquez no tenía edad para conducir el tractor, que Collazo tenía todos los tractoristas que necesitaba y que el Departamento del Trabajo daba instrucciones en la operación de tal equipo mediante paga, no es lógico ni creíble que Collazo asumiese el riesgo de permitir o autorizar a sus empleados para que

enseñaran a Velázquez cómo manejar tractores. La versión de Velázquez de cómo sucedió el accidente es muy difícil de creer, pues no es lógico que mientras operaba el tractor a su mayor velocidad Rivera, súbitamente, y sin razón, se levantase del asiento y pusiese a un menor inexperto a conducir el vehículo arriesgando así su propia vida. Más creíble es cualquiera de las dos versiones de Rivera, es decir, que Velázquez tomó el tractor en un momento en que Rivera se apartó del mismo (versión de Rivera según su testimonio), o que Rivera montó a Velázquez a su lado y el accidente ocurrió mientras Rivera lo manejaba debido a que uno de los carros que arrastraba el tractor "pisó una cadena que estaba empatada al carro" y obligó al "Zancú" a treparse por una pared virándose (esta versión consta de un escrito preparado por el letrado Avila Rivera, leído a Rivera y firmado por éste en su casa poco después del accidente, versión que Rivera negó fuera la cierta durante su testimonio). Tal parece que la versión de los recurridos es en gran parte producto de su imaginación. Es evidente, pues, que aun cuando el conductor Rivera invitara a Velázquez a montarse y conducir el tractor, no tenía autorización para hacerlo y al hacerlo se apartó de las atribuciones de su empleo.

De manera que sólo se podría responsabilizar a los recurrentes por las lesiones de Velázquez en caso de que su gestión de montarse y guiar el tractor "tiende al logro de la encomienda del patrono pudiendo redundar en beneficio de éste". Sobre este particular declaró el menor que los recurrentes tenían interés en que él aprendiera a manejar el tractor, específicamente Collazo Jr., "Porque yo era un buen muchacho y sabía trabajar". Admitió que en el momento en que guiaba el tractor el día del accidente no beneficiaba a los recurrentes. Más tarde dijo que los recurrentes se beneficiaban del hecho que él guiara el tractor "Porque yo iba a trabajar el otro año con él". Esta manifestación, como la anterior, son obviamente pura conjetura y especulación, ya que en

ese momento Velázquez no trabajaba para los recurrentes y éstos tenían todos los operadores que necesitaban y no se demostró que hubiese recibido promesa alguna de su parte para trabajar con ellos. Resulta evidente de lo expuesto que no se justifica concluir que la actuación de Velázquez de guiar el tractor al ocurrir el accidente tendía a lograr la encomienda de los recurrentes y podía redundar en beneficio de éstos.

*Por las razones indicadas, se revocará la sentencia dictada por el Tribunal Superior, Sala de Humacao, en 12 de noviembre de 1963, y se declarará sin lugar la demanda.*

